Thank you. Counsel, you may proceed, and please introduce yourself for the record. Yes. Good morning. My name is Michael Aguirre, and I represent the appellants. You want to lift up the mic a little bit? Yes. Is that better? I think that's better, yes. Thank you. Mr. Aguirre, I gather you were substituting for Maria Severson, who was counsel of record? She's my law partner. Very well. Our firm is the counsel of record. Very well. Please forgive me, Your Honors. I was over in the other courtroom admiring how beautiful it was and having wonderful conversations until I realized I'm in the wrong courtroom. All right. Very well. I'm so sorry to be here. You're here on time. Thank you. So. Thank you very much. Thoreau said that some circumstantial evidence is more powerful than others, and he gave us an example, trout in the milk. In this case, eight years ago, a low-level administration, administrative, and admissions officer went to a graduation at the Heritage College in Las Vegas, where he worked, and he observed the proceedings and then saw that afterwards there were five boxes of unpassed-out diplomas. From that day till today, he has been trying to pursue his case and to get justice. He asked his superiors at the time, why are there five boxes of diplomas that haven't been passed out? And they candidly admitted to him that was because those individuals were not in attendance at the school and had not been in attendance, and that that was the process that was followed. This was an example of a larger reality because these classes started every week or so. It was a machine. Counsel, I think we understand the background here. Your problem is to identify where in the complaint there is a reference to the false claim being filed. You may or may not necessarily have to go specifically to observing the false claim being filed, but you have to connect it up, do you not, under our Abide case? Absolutely. You know, Your Honor, I think. But in order to do that, you need to give us some help and show us where in the complaint you've done that. Well, the complaint alleges that there were applications for loans. That is what we're talking about. Application for a loan is a claim. This company was in the business of generating applications for loans. That was the whole purpose of the way that they get funded. So your position is the application for the loan filed by Kaplan, or in this case Heritage, I guess, is the false claim? Yes. That's one theory. That's one theory. And the ‑‑I think that it's clear that an application for a favorable government treatment is considered a claim under the False Claims Act. We have allegations that Kaplan was receiving from its Federal Student Aid an increase from $35 million in the year 2000 to $400 million in the year 2004. So this was an application. The application is what is ‑‑ we have a plethora of applications. That was the nature of it. And some portion of those applications identified as 50 percent in the complaint, according to what was said by the admissions made by authorized agents of Kaplan, not Heritage. That's a misnomer. Kaplan took over Heritage in May of 2003. This was in October of 2003. And then the subsequent reporting upped the line. And you'll see ‑‑ Okay. But I'm going to persist. Where in your complaint, and I guess we're talking about the Fourth Amendment, right? Right. Where in the complaint is there a reference to a false claim or something that could be considered a false claim to be filed by Kaplan? Let's start with ER 021, paragraph 46. All right. It identifies the time, which was before and after October of 2003, the place, Kaplan Heritage, and the content that students were, in fact, enrolled. The notice, this is notice of particular conduct, and it gave them certainly sufficient evidence to investigate the claim, which is, in fact, what they did. There was, in fact ‑‑ So that statement, you say, is sufficient to show, to allege a particular specific false claim that Kaplan actually submitted to the government? Yes. And for this reason ‑‑ That they're enrolled. Well, that they're ‑‑ that what the money is being requested, the money that's being requested by way of the loans, is, in fact, going to be used and is being used for education. And, in fact, that's not the case. When you show up and half the diplomas are not passed out, and then the people internally tell you that the diplomas, the reason they're not passed out is because we sign these people up, we have quotas, we sign them up as fast as we can. You can't even get a tour of the building unless you get all your applications filled out. And, you know, let me just say, this is not something that's not plausible. I think subsequent reality showed that it's largely true. And so what we're talking about also is I'd like to ask you just to think about how ‑‑ let's say that when ‑‑ that what I'm alleging is true, that the relator came in and discovered this. He then turned it over to the government. The government sat on the case for four years and five months. You will never have ‑‑ the 86 amendments were all designed because ‑‑ or were put into place, the reforms and making it easier to bring false claims case because they were concerned the government wasn't following up. This is ‑‑ Well, okay, that's part of it. But the thing is that if it were a really good case, you could also make the inference that the government would be interested in it. And you're ‑‑ you are Mr. Jodelsky's fourth lawyer? Yes. I like to think of myself as I had .43 percent of the total time to draft the complaint. I had 10 days to draft the complaint. So I am his fourth lawyer, but I believe in his ‑‑ let me not sponsor his case, but I believe that we as lawyers, when we see valid cases, we have an obligation to pursue them. And I know that ‑‑ Right. But you also ‑‑ you concede that you're under the higher standard of pleading standard. You don't ‑‑ you know, because it is a false claim and you're ‑‑ that 9B demands something more than a regular case. Absolutely, Your Honor. And so, you know, I'm looking at this and I'm saying, okay, it looks like you threw everything against the kitchen sink, that there's a lot of smoke, but I think 9B says you, if you don't have to have fire, you have to have at least a spark. And when you're saying let's look at this and say, well, the students enrolled, I don't see a spark there. Well, the students weren't enrolled. That's the spark. And internally they reported that they weren't, and it was a course of business. They had notice of the particular misconduct. We fit right within IBID. They had notice of the specific misconduct. There are ‑‑ here is the specific misconduct. There are diplomas that weren't passed out. Fifty percent, I'm reporting this to you. You need to follow up on it. And what happened? The diplomas disappeared. So the specific conduct was reported internally. Then it was reported to the Department of Justice. Many years later it was found out that it was largely true, that there are these massive problems. But it was reported to the Department of Justice. Nothing was done. And that is my point, is that if you look at IBID, it says, notice of particular misconduct of the fraud so it can defend. And we gave notice. How much more specific can you be? This actually gave the name. Sotomayor You can be a lot more specific because I'm having a hard time trying to figure it out myself. If ‑‑ are you alleging that there were actual human beings that showed up, they filled out these applications, they got these loans, and then they never went to school? Yes. Fifty percent. Wait a minute. Wait, wait, wait. Yes. Or that they concocted fake names, fake identities, fictitious people, and then put in four loans? No. They had ‑‑ it was a former, but they had a system in place where those individuals didn't show up and they continued to keep them on the rolls. Instead of returning the money to the government. That was the problem. And it was a systematic. This was an exemplar. Well, all of this is true. Why couldn't you set forth this with greater particularity? Because I certainly had a hard time finding it. I can see why Judge Dawson did, because I had a hard time trying to figure it out. Okay. You asked me that personal question. I'll give you a personal answer. I had 10 days to draft the complaint. I was ‑‑ I substituted it into the case. I requested a hearing, a meeting, a conference with the magistrate. Let me take you personally out of the equation. Okay. There were a lot of other lawyers in this case. But, Your Honor, I would say, as I said at the beginning, if they identify the problem with the specificity they did, they actually did give the names of the individuals who were involved, and those are alleged. And you put this in the context of the company acquiring, moving from, as I said, $35 million to $400 million, acquiring all these other different companies that ‑‑ in an area that is fraught with these types of risks, and then you have the government not do anything about it for four and a half years, the idea of the system is not going to work this way. If you ‑‑ because it didn't work. Well, let me ask you ‑‑ let me ask you this. I think we really want to focus you on ‑‑ one of the things that you point to is an All right. But what I'm saying is why is that allegation sufficient when you don't allege when the student finished the program at Heritage, the events you discuss occurred before Kaplan acquired Heritage, and you don't allege that Kaplan actually received financial aid for the student while she was not enrolled? So that's the specificity, I think, that 9b requires, and it's just not there. Well, 9b requires facts from which you can infer, facts from which you can infer, and that was a particularized example, but the larger whole, the larger whole ‑‑ But the particularized advance ‑‑ the particularized example that you're claiming doesn't have the facts that would make it particularized. Well, in that particular case, Your Honor, the person was brought back after they were already shown to have graduated. They were brought back after they were already shown to have graduated. That was a fraud on the government. They hadn't graduated, and that's what is particularized. But beyond that, the nature of the claims here is you have a ‑‑ You just lost me. You said they were brought back after they graduated, but they hadn't graduated. They were shown on the books as having graduated. But you don't allege that the student finished the program. You don't even allege that. The student ‑‑ the student before the student was graduated didn't finish the program. That's the part. That's the point. They were ‑‑ what happened was the student dropped out, but they were shown on the records as having been graduated. Okay. But did they ‑‑ but you want us to assume that the person received financial aid, but you don't even allege that. Your Honors, these businesses, 94 percent, 98 percent of the financing that comes from these businesses come from financial student aid. But did you allege it as to that student? Your Honor, impliedly, of course. Of course. Because that's ‑‑ because, Your Honor, that was ‑‑ the point of that student wasn't to say that they had received financial aid. The point of that student was to emphasize the fact that they had been shown as graduated and had come back after that. The allegations ‑‑ again, the allegations are that people are shown as having been in the programs when, in fact, they weren't in the programs. So the government paid to have someone go to the programs, and reporting back was 50 percent. The people didn't actually go through the programs. So the government paid for education that wasn't delivered. And after the claim was brought, the government took no action and did not proceed. Now, later on, we found out through admissions of counsel that there had been some investigation done by the Department of Education and there was a settlement from which the plaintiff was excluded. So his case, if you think about it, 75 percent of the time that his case was before the ‑‑ was before the court, it was either frozen by the Federal Government or it was under submission by the judge. So I would ask you at the very ‑‑ at bare minimum, if you don't feel that our complaint is specific, I would ask you to at least allow him, in light of the ‑‑ to give us a chance to get it straightened out. As I said, I had 0.4 percent, 4.3 percent of the time, 10 days to draft this complaint. We worked on it night and day. There is a viable claim here, and if we're given the opportunity, we can't allege it. Thank you very much. And let's go ahead. I'm sorry. Roberts. You have some reserved time.  Thank you. We'll hear from the ‑‑ from Kaplan. Thank you. May it please the Court. My name is Tim Hatch, and I'm here on behalf of Defendant Appley Kaplan, Inc. I'd like to begin by picking up on the questions asked by Judge Callahan and Judge Ezra regarding the one example of a student who had enrolled, who had dropped out, but yet was showed on the books as a graduate. A couple points of background first. Up until the Fourth Amended Complaint, Mr. Joudelsky had not identified a single student of that sort. And almost all of the facts that he had alleged related to time period prior to Kaplan's acquisition of heritage. But we're on the Fourth Amendment complaint now. That's the only one that counts, right? Correct. Correct, Your Honor. So if Rule 9b did not apply, you know, I said to Appellant's counsel that, you know, you've got a lot of smoke here, but I need at least a spark. Do you think if Rule 9b did not apply, do you think this plaintiff's complaint would satisfy the general pleading requirements of Rule 8? And, I mean, doesn't he allege a plausible theory that Kaplan used phantom students to fraudulently secure financial aid? So if — give me an example of an allegation in your view that would be sufficient under 9b. So I — and because we've got 8 and 9b, you know, and that's — it's — there's — it's — is it science or is it, you know, what's involved here? You know, when's enough enough? Yes, Your Honor. The complaint, the Fourth Amendment complaint, does not come close to satisfying Rule 8 or Rule 9b. And let's focus on that, again, that single example of a student who Mr. Joudelsky alleged was kept on the books even after she dropped out. When you look at the allegations in the complaint in paragraph 64, Your Honor, by Mr. Joudelsky's own admission, that took place several years prior to Kaplan's acquisition of heritage. This was not an allegation of conduct and or a claim by Kaplan. By Mr. Joudelsky's own admission, it happened several years prior to Kaplan's acquisition. So that by itself, Your Honor, we believe is — is — shows that the — the relators have not alleged any conduct, particularized or otherwise, by Kaplan that would be sufficient to support a False Claims Act cause of action. I'm looking at paragraph 46, and I'm beginning to think that maybe your opponent has something going here when he says that this was explained to a relator by the college's director that financial aid requests submitted to the federal government for Title IV funds and the associated funds could now be drawn down for Kaplan's use. This would explain that once a student was on the program for seven class days and is eligible to draw down financial aid applied for on behalf of those enrolled students. Why isn't that enough to put the — Kaplan on notice of this false claim theory? Well, Your Honor, all that is being alleged in paragraph 46 is the normal procedure regarding eligibility and drawing down of Title IV funds. What the rules set by the Department of Education provide is that once students are fully packaged and are eligible for Title IV funds, when they attend classes for a certain period of time, that schools are then entitled to draw down the funds that are available to that student. That's all that's alleged in that paragraph. What has to be alleged and what's not alleged is students who either did not attend classes or dropped after attending classes while Kaplan was in control of Heritage and that those students and Kaplan continued to draw down and receive Title IV funds with regard to those students. What is alleged in paragraph 46 is very generic and just a description of the normal process for Title IV funds. But taken in context, does it not reveal a pattern of accumulating all of these such that when the request for reimbursement went to the government, it was fraudulent? I don't see that, Your Honor. Limiting it to this paragraph or limiting it to the whole complaint. I mean, what's described here would be equally applicable to any and all educational institutions. All educational institutions have to package the students who are applying for eligibility for Title IV program funds. All educational institutions have to draw down those funds once the students begin to attend classes and become eligible for those funds. But what would he have to add, in your view, to make it for that allegation to be sufficient under 9b? I think what they would have to allege would be, you know, one example, several examples that they've tried to allege in paragraph 64 where a Kaplan student, where a student after Kaplan acquired the school either did not enroll or dropped, and Kaplan continued to impermissibly seek funds for that student. There is not a single allegation in this complaint that at any time did Kaplan – and for that matter, there's not an allegation that Heritage did either – but that Kaplan sought and received Title IV funds for students who did not enroll or for students who had dropped out. You know, Mr. Jodelsky makes a great deal of this graduation. They had one student that could push it over the top with the rest of the smoke. I'm sorry. You're saying if they had one student? Yes, that could actually – that they could allege that, and then that would get them past this particular motion. Of course, Your Honor, they don't, in that the one student they do put forward was a student who had enrolled and dropped several years prior to Kaplan's admission. If they did, Your Honor, that would certainly get them much closer. I think there would still have to be additional allegations that are not in the complaint that, indeed, with regard to that student, that Kaplan did seek and received Title IV funds. I think there would have to be allegations that would go to the – the scienter element as well. But you're right, Your Honor, if there was one example, or certainly more than one example, I think that would get them closer. Well, now, you try to – you make the claim of that the first rule to file applies here. But when I look at the Lujan complaint that you cite from the Western District of Pennsylvania, it alleges that Kaplan manipulates job placement figures, but at a different school and for the purposes of attracting students, not to get financial aid. Now, so it just seems to be different allegations. So the first rule to – the first rule to file wouldn't apply if it's a different type of lawsuit. And then besides that, okay, since you allege that, now I've got this big stack that Mr. Jodelsky's counsel now wants – since you opened that door, now they've said, well, look here, it really isn't the same case. And so, I mean, don't we have to admit that now? No, Your Honor. Paul, if you're – if we gave judicial notice on yours, it certainly seems that his lens, it's fair. Your Honor, the first to file rule does not apply to the allegations or the claim relating to Phantom students. What it applies to is a new claim that was added in the Fourth Amendment complaint regarding placement rates and an allegation that Kaplan submitted inflated or false placement rates. It has nothing to do with Phantom students, Your Honor. With regard to the placement rate allegation, we believe that the district court properly disregarded that, but in addition, we think that that is – is and should be dismissed on any one of three separate grounds. One of them is the first to file, because while – when those allegations were made in the Fourth Amendment complaint, there was another case already pending against Kaplan in which allegations regarding the placement rates had been made. So do you object to his – what he's asking for judicial notice on, since you already got what you judicially noticed? We do not, Your Honor. Okay. One other point I would make quickly with regard to placement rates is – is similar to the allegations relating to – with regard to the Phantom students. There really is – is sort of much less there than – than Mr. Jodelsky would have you believe. Again, looking at the complaint, specifically paragraphs 67 and 68, the plaintiffs' case, all he alleges there is that Ms. Fincher told Mr. Jodelsky that she was directed to use a mathematical formula provided by the school director that she did not believe would generate accurate numbers. She then alleges that five days later, the director provided to Ms. Fincher numbers that showed nine of the 14 programs offered by Heritage resulted in placement rates less than 70 percent, the minimum rate required by the accreditor. So, again, this is – they're trying to – to create this illusion, this impression of a bad actor, but that's not what is required under Rule 8 or under Rule 9b, which obviously does apply here. It can't be because the whole for-profit education sector is flawed or is bad in some sort, and that's really what seems to be here. When you look at what claims were submitted by Kaplan, there aren't any. And that really, you know, should be the end of the inquiry, we believe. Roberts. Anything further, counsel? No, Your Honor. Thank you. Mr. Aguirre, you have some reserve time. Just give him a chance. Give him a chance. Give him a chance. Sorry. Run him over there. Your Honor, we can allege – Hold on, please. Okay. Allow opposing counsel to get back to his seat, please. Oh, I'm sorry. Okay. I'm sorry. Pardon me. Please forgive me, counsel. Sorry. All right. Very well. Okay. You may continue. Thank you. Your Honor, we can allege additional facts because after congressional investigation, Kaplan had to change and allow people to go a few weeks for free and it dramatically dropped off. They showed up to 60 percent of the people were gone after a year and a half or so. We have additional facts to allege now that that came out later. Is that in this case? That is in the overall. In the record. No. I only offer that for one purpose, and that is the issue about whether we could amend. I wanted to make a representation to the Court that I do have a good faith basis for amending. Did you make that representation before the trial, Judge, when you sought leave to amend one more time, which was denied? We did not have that information, Your Honor, because the Senate report came out after that. So there's been a Senate report that documented this. And I just wanted to put that and make sure that that's something that Your Honors knew. And then the placement theory, the certification, the false certification to us grew out of and was grew from and was not a separate claim and the placement was not a separate claim. If 50 percent of your people aren't showing up and you're showing 70 percent placement, then that is a false representation to the government that you are, in fact, in compliance with a regulation after which you – sorry, my time is up. Thank you. All right. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. Hearing, hearing. All parties, I suggest this be called a vote. The next case is court-appointed. The last part for this Court, for this session, has been adjourned. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Ezra, O'scannlain, Callahan